UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

KAREN ALWARD,                    :

    Plaintiff,               :

V.                               :    CASE NO. 3:08-CV-1952(RNC)

CONNECTICUT DEPARTMENT OF        :
PUBLIC SAFETY,

    Defendant.               :

<u>RULING AND ORDER</u>

Plaintiff Karen Alward, a former Connecticut State Trooper trainee, brings this case pursuant to Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq.*, against her former employer, the Connecticut Department of Public Safety ("DPS"), alleging that she was terminated and subjected to a hostile work environment because of her gender.[1]  The defendant has moved for summary judgment.  The plaintiff has produced sufficient evidence to allow a reasonable jury to find in her favor.  Accordingly, the defendant's motion is denied.

I. Summary Judgment

Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

---

[1] The complaint also alleges violations of the Connecticut Fair Employment Practices Act (CFEPA).  By agreement of the parties, these claims are dismissed without prejudice to refiling in state court.

R. Civ. P. 56(a).  To avoid summary judgment, plaintiff must point to evidence that would permit a jury to return a verdict in her favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  In applying this standard, the Court must view the evidence in a light most favorable to the plaintiff, resolving all ambiguities and drawing all reasonable inferences in her favor.  Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).

II. Background

In January 2007, plaintiff entered the Connecticut State Police Training Academy as a trooper trainee.  There were approximately 70 trainees in the class, 8 of whom were female. Plaintiff claims she was held to a higher standard at the Academy than male trainees because of her gender.  According to the plaintiff, a number of instructors told her it was less acceptable for her to make mistakes than her male counterparts because men, being stronger, could "afford to get themselves into a bit of trouble."[2]

Plaintiff received negative reports in firearms courses and in the emergency vehicles operations course ("EVOC").[3]

_____

[2]  At her deposition, plaintiff testified that she could not remember which instructors told her this, but she thought it might have been Mark Wyler and some of the defensive tactics instructors.

[3]  Specifically, she received a report noting that her Marksmanship Skills Assessment was unsatisfactory.  Six males and

Additionally, she received a negative report in the area of
Trooper Safety and Survival.  She performed poorly on the Driving
While Intoxicated ("DWI") practical exam.  Despite her
performance issues, plaintiff graduated from the Academy.[4]

Upon graduation, plaintiff was assigned to Troop B for field
training.  Plaintiff was one of only two women in Troop B and was
the first woman assigned to Troop B for field training in several
years.

Plaintiff began her field training on July 23, 2007.  It was
originally scheduled to last 30 days.  During the training,
plaintiff was accompanied and trained by a series of male field
training officers ("FTOs").  FTO Bonetti trained the plaintiff
for her first six days.  He rated her as acceptable to superior
in every category on the first five days.  On day 6, Bonetti
rated plaintiff as unacceptable in the area of officer safety.
During this period, Bonetti told plaintiff that she came with

---

two other females also received unsatisfactory marksmanship
marks.  After this report, plaintiff received verbal remedial
training.  Plaintiff also failed the Pistol Marksmanship
practical examination twice.  She and the other two trainees who
failed this exam all received remedial training.  After the
remedial training, one trainee failed again and did not graduate.
The plaintiff and the third trainee, a male, successfully
completed the exam but were recommended for additional practice
prior to graduation.  At one point, plaintiff, along with other
male and female trainees, was placed on academic probation for
her failure of the firearms practical and her failure to complete
the EVOC make-up course.

[4]  Ten trainees did not graduate from the academy: nine
males and one female.

"instructions from the Academy."  Plaintiff infers that this comment had something to do with her gender.

From day 7 to 11, plaintiff was observed by FTO Nigro.  On every day except day 9, Nigro rated plaintiff as unacceptable in several areas including acceptance of feedback, field performance, and officer safety.  In early August 2007, Nigro told plaintiff that she and the other female in Troop B should be assigned only to paperwork where they would be safer.  Later that same week, Nigro stated that the plaintiff reminded him of his wife, who could never work as a trooper.  Plaintiff complained about Trooper Nigro's comments to one of her sergeants.  The sergeant told plaintiff that the comments were not a big deal.  The sergeant then reported the comments to Lieutenant Dale Hourigan, the Commanding Officer of Troop B, who told plaintiff she was lying.

From day 12 to day 16, plaintiff was trained by FTO Hazen.  On day 14, Hazen rated the plaintiff unacceptable in officer safety and provided remedial training in this area.  Hazen did not rate the plaintiff unacceptable on any other day.

From day 17 to day 21, plaintiff was trained by FTO Roy.  Roy only rated the plaintiff as unacceptable on day 19 (in the areas of officer safety and acceptance of feedback).  Trooper Roy continuously called plaintiff "Ms. Daisy" in order to insinuate that she drove too slowly.

On days 23 and 24, FTO Puzzo evaluated the plaintiff.  He

4

rated her as unacceptable in several areas including officer safety.[5]

Trooper Roy again evaluated the plaintiff on day 25 and provided no unacceptable ratings.

FTO Bonetti again trained plaintiff from days 27 to 31, and on all of those days he rated plaintiff as unacceptable in several areas including officer safety.

Plaintiff's initial field training concluded on September 10, 2007.  At this time, plaintiff applied for a job as a fire marshal in the Town of New Milford.  She was still employed by DPS.

On September 11, 2007, the plaintiff met with Lt. Hourigan. Due to plaintiff's performance issues, Hourigan decided to extend her field training program.  On September 14, 2007, Hourigan sent the plaintiff a letter explaining the basis for his decision in writing.  The letter also recommended remedial training at the Academy.

During the first day of the extension (day 32 overall) the plaintiff was evaluated by FTO Janco.  Janco rated the plaintiff as unacceptable in the areas of officer safety, driving skills

---

[5] Plaintiff alleges that Puzzo became unhappy with her because she would not sleep through her shifts with him. According to plaintiff, Puzzo would drive to his driveway during the 2 AM to 6 AM shift and sleep in his car.  The male trainees also slept, thereby currying favor with Puzzo.  Plaintiff did not sleep the whole time, and she alleges that this caused Puzzo to dislike her.

and field performance.

During the remainder of the first extension, day 35 to day 38, plaintiff was trained by Trooper Strolis.  Strolis rated the plaintiff as unacceptable in most areas except for day 36, when he rated the plaintiff acceptable or better in all areas.  Around this time, Strolis informed the plaintiff that she had been labeled for termination by the other FTOs, and as a result he was supposed to give her poor practical evaluations.[6]

On September 25-26, at the conclusion of the first training extension, plaintiff was sent back to the Academy for remedial training.  The Academy staff were not satisfied with plaintiff's performance.[7]  Accordingly, on September 28, 2007, the field training program was extended for a second time.  During this second extension, the plaintiff was again supervised by Strolis.  Although she received acceptable or higher ratings in all categories on at least two days during the second extension, plaintiff was rated as unacceptable on at least one day.

Plaintiff contends that all the FTOs she dealt with, except for Troopers Hazen and Janco, treated her differently and gave her negative evaluations because of her sex.

In either September or October, Lt. Hourigan said that he

---

[6] Sarah Salerno, another member of Troop B, allegedly confirmed that plaintiff had been marked for termination in this way.

[7] Specifically the staff was concerned with her performance fo a motor vehicle stop scenario.

had an issue with plaintiff's size, her sex and the fact that she had two children at home she had to worry about.  Hourigan said that the plaintiff had concerns that male troopers do not have, and that she needed to weigh those carefully.  Hourigan also told the plaintiff he was concerned about her safety because of her size.[8]

On October 5, 2007, which was day 42 of field training and in the middle of the second extension, Hourigan ordered plaintiff to report to headquarters and terminated her.  On October 11, 2007, plaintiff was notified by Hourigan in writing that she was being dropped effective October 25, 2007, due to her inability to perform the duties of a State Police Trooper trainee.  On October 17, 2007, Hourigan provided plaintiff with a letter of recommendation for the position as a New Milford Fire Marshal.[9]

While the plaintiff signed the majority of her performance evaluations, she contends that the negative evaluations from both the academy and field training were, for the most part, a product of sexism among the state troopers.  To support this, she points to informal meetings that were organized at the academy for the female trainees in order to equip them to deal with the unique challenges of the heavily male-dominated organization.  She

---

[8] In addition to these comments, Hourigan expressed concern over the plaintiff's inability to receive constructive criticism and follow directions from FTOs.

[9] The letter praised plaintiff's investigative and report writing skills.

contends that most of her negative performance issues occurred in practical areas, which are subjective and subject to manipulation.[10]  She also highlights the comments made by various FTOs as evidence of sexist attitudes.

Plaintiff was aware that she could file a complaint with the Affirmative Action Office at the Department of Public Safety, but she did not do so until she was let go.  While working for DPS, she never submitted a written complaint alleging that she was being treated differently because of her sex.  Plaintiff alleges that she refrained from complaining for fear of retaliation.

III. Discussion

A. Disparate Treatment

Title VII makes it unlawful for an employer "to discharge any individual . . . because of . . . race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Claims that a plaintiff was terminated in violation of this provision are evaluated under the McDonnell Douglas burden-shifting framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under this framework, a plaintiff must first establish a prima facie case of discrimination by showing: (1) she is a member of a

---

[10]  Plaintiff also contends that her negative field training evaluations were the product of injuries to her thumb and ankle. The thumb injury was allegedly quite severe and she reported it to Sergeant Katherine Teel, but Teel did not provide her with workers compensation or time to recover.  Plaintiff alleges that this treatment was based on her gender because on one occasion Teel had denied plaintiff access to a cell phone to call her children's nanny to say she would be late.

protected class, (2) she was qualified for the position, (3) an adverse employment action occurred and (4) the action occurred under circumstances giving rise to an inference of discrimination.  Id. at 802; Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000).  If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action. If the defendant can articulate such a reason, the burden shifts back to the plaintiff to produce sufficient evidence to support a rational finding that the defendant's neutral explanation is a pretext for discrimination.  Id.

Defendant argues that plaintiff's repeated poor performance evaluations demonstrate that she was unqualified for the position and, therefore, she has failed to establish a prima facie case. Defendant further contends that even if the plaintiff has established a prima facie case, those same performance evaluations provide a legitimate, non-discriminatory reason for her termination.

Though the issue of the plaintiff's qualifications and the issue whether there was a legitimate, non-discriminatory reason for her termination are closely related, they are distinct requirements.  "As [the Second Circuit has] repeatedly held, the qualification necessary to shift the burden to defendant for an explanation of the adverse job action is minimal; plaintiff must show only that [she] possesses the basic skills necessary for

9

performance of the job." Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 92 (2d Cir. 2001)(internal citations and quotations omitted). "[T]he step at which the court considers such evidence is important. A plaintiff can rebut the employer's proffered legitimate, non-discriminatory reason by proving that discrimination played a role in the employer's decision, but no amount of evidence permits a plaintiff to overcome a failure to make out a *prima facie* case." Ruiz v. County of Rockland, 609 F.3d 486, 493 (2d Cir. 2010).

Here, although no job description has been submitted, the evidence would permit a rational jury to conclude that the plaintiff was minimally qualified for the job of a Connecticut State Trooper. The plaintiff had been hired as a trooper trainee, graduated from the Academy and received acceptable or superior ratings on several days during the field training program. Further, Lt. Hourigan wrote plaintiff a letter of recommendation in which he praised her investigative skills and report writing ability. The record establishes that plaintiff did receive multiple negative performance evaluations, many in the important area of officer safety. But her positive evaluations, the letter from Hourigan, and her graduation from the Academy permit a reasonable jury to find that she was at least minimally qualified. See Aulicino v. N.Y.C. Dep't of Homeless Servs., 580 F.3d 73, 81 (2d Cir. 2009). Accordingly, plaintiff has met her burden of establishing a prima facie case.

Turning to the issue of pretext, plaintiff attempts to demonstrate that the negative evaluations she received are false by pointing to gender-based remarks made by DPS employees. Gender-based remarks directed at the plaintiff by a person with decision-making authority or a person with influence in the decision-making process can serve as evidence of discrimination sufficient to undermine the defendant's proffered reasons and establish pretext. <u>Back v. Hastings on Hudson Union Free Sch. Dist.</u>, 365 F.3d 107, 124 (2d Cir. 2004); <u>see also</u> <u>Crawford v. Dep't of Investigation</u>, 324 Fed. App'x 139, 142 (2d Cir. 2009). Such remarks can constitute direct evidence of discrimination as long as they are connected to the employment action at issue. <u>Crawford</u>, 324 Fed. App'x at 142. "The relevance of discrimination-related remarks does not depend on their offensiveness, but rather on their tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class." <u>Tomassi v. Insignia Fin. Grp., Inc.</u>, 478 F.3d 111, 116 (2d Cir. 2007).

The plaintiff's testimony indicates that Lt. Hourigan, who ultimately made the decision to terminate the plaintiff, directed gender-stereotyping remarks at the plaintiff around the time of her termination. Hourigan stated that he had an issue with plaintiff's size, as well as the fact that she was female and had two children at home. Hourigan told plaintiff she needed to weigh those considerations carefully. <u>See</u> <u>id.</u> at 112, 116

11

(holding that age-related comments, including that the plaintiff might enjoy retiring and taking time off to rest, constituted evidence of age discrimination).  These comments by Hourigan, if credited, tend to show that his decision to terminate plaintiff was motivated by his assumptions and attitudes relating to women.

In addition, plaintiff alleges that many of the FTOs who gave her negative performance reviews were influenced by sexism. Those negative reviews were then used to justify her termination. Trooper Nigro remarked that the plaintiff and the other female trooper in Troop B should be assigned solely to processing prisoners because they were better at paperwork and should be where they were safer.  On a separate occasion, Nigro told the plaintiff that she reminded him of his wife who could never be a trooper.  Plaintiff complained about these remarks to Lt. Hourigan, who ignored them and told the plaintiff she was lying.

Trooper Roy referred to plaintiff as Ms. Daisy.  Viewed in the light most favorable to the plaintiff, this nickname could reflect a view that females are not as capable at driving as males.  See Ash v. Tyson Foods, Inc., 546 U.S. 454, 456 (2006)(holding that the word "boy" does not require an additional racial modifier to provide sufficient evidence of discrimination to create a question for the jury).

Trooper Strolis told the plaintiff that she had been marked for termination and that he was instructed to give her low marks so that she would be terminated.  Strolis stated that it was the

other FTOs who sought to have plaintiff terminated.  A jury could reasonably infer from the sexist comments several FTOs made to plaintiff that in seeking to mark her for termination, they were motivated by discriminatory intent.

Viewed in the light most favorable to the plaintiff, these remarks by Lt. Hourigan and the FTOs would permit a rational jury to conclude that DPS's stated reliance on the plaintiff's poor performance evaluations was merely a pretext for discrimination. At a minimum, the remarks would allow a reasonable jury to find that the defendant was motivated both by discrimination and plaintiff's poor performance.  Holcomb v. Iona College, 521 F.3d 130, 141-42 (2d Cir. 2008)(noting that under Title VII, a plaintiff need only establish that the impermissible factor was a motivating factor).[11]

---

[11] Plaintiff also contends that she was treated differently than similarly situated males, demonstrating pretext.  "To be similarly situated, the individuals with whom [plaintiff] attempts to compare herself must be similarly situated in all material respects."  Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997)(internal quotations omitted).  The plaintiff has not pointed to a sufficiently similar comparator to support such a conclusion.  The record indicates that throughout the Training Academy the plaintiff received comparable treatment to males with similar training difficulties and that while the plaintiff graduated from the training academy, several males did not.  Plaintiff provides no evidence of a sufficiently similar male comparator who was treated differently while on field training.  Nevertheless, the gender stereotyping remarks are sufficient, by themselves, to overcome summary judgment.  Back, 365 F.3d at 121 ("Defendants are thus wrong in their contention that [plaintiff] cannot make out a claim that survives summary judgment unless she demonstrates that the defendants treated similarly situated men differently.").

13

B. Hostile Work Environment

Plaintiff also contends that DPS employees' remarks created a hostile work environment in violation of Title VII.  To establish a prima facie case of hostile work environment, "a plaintiff must produce evidence that the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment."  Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000)(internal quotations omitted).  Whether conduct is sufficiently severe or pervasive is determined on the totality of the circumstances including the frequency of the conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with the plaintiff's work performance.  Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

However, "[t]he fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious of cases."  Torres v. Pisano, 116 F.3d 625, 631 (2d Cir. 1997).  Moreover, in order to have an actionable sex-based hostile work environment claim, the hostility need not be prurient or sexually explicit in nature.  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998); Dawson v. County of Westchester, 373 F.3d 265, 274 (2d Cir. 2004).  Instead, the critical question is "whether the workplace atmosphere,

14

considered as a whole, undermined plaintiffs' ability to perform their jobs, compromising their status as equals to men in the workplace." Dawson, 373 F.3d at 274.

The Second Circuit has indicated that courts should be particularly sensitive to sex-based hostile work environment claims in law enforcement, prison or first responder settings where officers must depend on each other for protection and on their own ability to assert authority in potentially dangerous situations. Id. at 273. "[F]emale officers may be particularly vulnerable to such diminution of authority in circumstances such as these . . . because of stereotypical assumptions about the propriety of women exercising authority in traditionally male-dominated occupations." Id. See also Howley v. Town of Stratford, 217 F.3d 141, 154 (2d Cir. 2000)(denying summary judgment when defendant's tirade diminished the respect accorded the officer impairing her ability to lead in the life-threatening circumstances faced by firefighters).

Here, none of the alleged comments directed at the plaintiff were prurient in nature. But the comments were frequent. All the comments took place within a two month period. Plaintiff alleges that Trooper Roy's nickname for her, Ms. Daisy, stuck with her throughout her field training. Taken individually, none of the comments was severe. However, given that the comments occurred in the law enforcement context, a traditionally male-dominated field where an officer's authority and confidence are

15

integral to job performance and safety, a rational jury could conclude that the plaintiff was subject to a hostile work environment that undermined her ability to perform her job.[12] This case falls somewhere between innocent teasing and actionable harassment, and so the "informed judgment of jurors is appropriate." See Brennan v. Metropolitan Opera Ass'n, Inc., 192 F.3d 310, 322 (2d Cir. 1999)(Newman, J., dissenting)(when questions linger regarding whether conduct is severe enough to constitute a hostile environment, the question is best left to the community – the jury).[13]

IV.  Conclusion

Accordingly, the motion for summary judgment (doc. 19) is hereby denied.

So ordered this 30th day of September 2011.

_____/s/ RNC_____
            ROBERT N. CHATIGNY
            UNITED STATES DISTRICT JUDGE

---

[12]  Troop B had only one female other than the plaintiff.

[13] In addition to the requirement that the environment be objectively hostile, the plaintiff must demonstrate that she subjectively perceived it to be hostile. Raniola v. Bratton, 243 F.3d 610, 620 (2d Cir. 2001).  Here, plaintiff manifested her subjective belief that the environment was hostile by complaining about Trooper Nigro's comments to her commanding officer. Recognizing that she did not complain about every comment, she plausibly explains that further complaints on her part were discouraged both by Lt. Hourigan's negative reaction to her complaint and what she characterizes as a culture of retaliation.